UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BRIGADIER ROOFING, INC.,

        Plaintiff,

    v.

ROOFERS' UNIONS WELFARE TRUST
FUND,

        Defendant.

No. 14 CV 10496

Judge Manish S. Shah

MEMORANDUM OPINION AND ORDER

Plaintiff Brigadier Roofing, Inc., brings claims for restitution, fraudulent misrepresentation, and negligent misrepresentation against defendant Roofers' Union Welfare Trust Fund, seeking a refund for Brigadier's payments to the Fund. The parties cross-move for summary judgment, and Brigadier also moves to strike materials from the Fund's summary judgment briefing. For the following reasons, Brigadier's motions are denied, and the Fund's motion for summary judgment is granted.

I.    **Motion to Strike**

The Fund filed a Local Rule 56.1 statement of additional facts supported by a supplemental declaration from its manager, Julie Rachal, [92-3], and a declaration from Sue Bacigalupo, [92-2], secretary for the roofers' union.[1] Bacigalupo's declaration states that the union maintains records of each signatory employer's

---

[1] Bracketed numbers refer to entries on the district court docket.

surety bond documentation, that she reviewed that documentation, that Brigadier notified the union in 2012 that its surety bond had been canceled, that the union had not received any further surety bond documentation from Brigadier, and that Brigadier informed the union in March 2015 that it was revoking its membership. [92-2]. Brigadier moves to strike Bacigalupo's declaration under Federal Rule of Civil Procedure 37(c)(1) because the Fund did not include her in its initial disclosures or interrogatory answers as a person with knowledge of the Fund's defenses. Brigadier argues that "[u]nder Rule 37(c)(1) 'exclusion of non-disclosed evidence is automatic and mandatory . . . unless non-disclosure was justified or harmless.'" *Tribble v. Evangelides*, 670 F.3d 753, 760 (7th Cir. 2012) (quoting *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004)). The Fund responds that it did not need to supplement its disclosures to identify Bacigalupo because the information in her declaration was known to Brigadier (i.e., Brigadier knew that it had not notified the union that it obtained a surety bond in March 2015). The Fund also argues that there is no prejudice to Brigadier because Brigadier knew that it had not notified the union about the bond, Brigadier does not contest that it did not notify the union, and Brigadier did not seek to question other union representatives at their depositions about whether the union received notice of the bond.

Even if the Fund did not disclose Bacigalupo as a witness with knowledge of its defenses, the Fund did disclose several union trustees, and it was obvious from the nature of this case (a dispute over contributions made to the union's welfare

benefit plan) that the union was one of a few entities with possible knowledge of this dispute. Bacigalupo's declaration largely confirms otherwise undisputed facts known to Brigadier. Brigadier has admitted that its surety bond was canceled in November 2012, [92] ¶ 13, that did not notify the Fund about the surety bond until August 2016, [95] ¶ 54, and that in March 2015, it told the union that it was revoking its membership as a signatory to the collective bargaining agreement. [92] ¶ 39; [95] ¶¶ 55–56. In these circumstances, the Fund's failure to disclose Bacigalupo is harmless, and her declaration and the Fund's statements of additional facts supported by her declaration are not stricken.

Brigadier also moves to strike paragraphs 3–8 of the Fund's statement of additional facts and paragraphs 5.a–5.f of Rachal's supplemental declaration, arguing that these paragraphs are outside Rachal's knowledge as manager of the Fund. Paragraphs 5.a–5.f detail whether other employers were performing work in the union's jurisdiction, whether they terminated their agreement with the union, or whether they had filed for bankruptcy. [92-3] ¶ 5. Rachal states in paragraph 5 that, as part of her Fund Manager responsibilities, she reviews and maintains information and records on the status of signatory employers to the union's collective bargaining agreement, including whether they obtained the required security, whether they have terminated the agreement with the union, and whether they are performing work in the union's jurisdiction. These details are within Rachal's personal knowledge and are not stricken.

Brigadier also moves to strike paragraphs 13, 17–19, 21, 24–25, 28, 31–39, 41–44, 46, and 50–51 of the Fund's responses to Brigadier's Local Rule 56.1 statement of facts, maintaining that these responses contain legal or factual arguments, or do not cite evidence supporting the denial. This motion to strike is overbroad and denied. In many instances, the parties' Local Rule 56.1 statements of fact and corresponding responses are overbroad, argumentative, or do not cite record evidence to properly controvert the factual statement. The purpose of Local Rule 56.1 is to permit the district court to identify at summary judgment which material facts are in dispute. The parties' Rule 56.1 statements (and responses) are viewed with this principle in mind. Unless otherwise noted, the facts related below are undisputed or are considered undisputed because the responding party did not properly controvert the factual statement as required by local rule.

## II. Background[2]

In 1995, Brigadier Roofing, Inc., signed a Memorandum of Understanding with the United Union of Roofers, Waterproofers, and Allied Workers Local No. 11, binding Brigadier to a collective bargaining agreement negotiated between the union and the Chicago Roofing Contractors Association, Inc. (of which Brigadier became a member). [92] ¶ 11; [95] ¶¶ 4, 7. The collective bargaining agreement required Brigadier to contribute to the union's related trust funds—including the Roofers' Unions Welfare Trust Fund (a multi-employee welfare benefit plan under

---

[2] [92] is the Fund's response to Brigadier's LR 56.1 statement of facts. [95] is Brigadier's response to the Fund's LR 56.1 statement of facts. [99] is the Fund's response to Brigadier's LR 56.1 statement of additional facts. [101] is Brigadier's response to the Fund's LR 56.1 statement of additional facts.

ERISA)—and to be bound by the trust agreement creating the Fund. Brigadier was required to pay contributions to the Fund (to pay for the welfare benefits provided by the Fund) based on the hours worked by each covered employee. [92] ¶ 5; [95] ¶¶ 3, 5, 7–10, 14–17. The collective bargaining agreement also required Brigadier to furnish a surety bond or alternate security in case it became delinquent in paying employee wages or contributing to the union's trust funds. [92] ¶ 12; [95] ¶¶ 21–23. Under the collective bargaining agreement, the union could withdraw employees from the employer or use other measures if the employer failed to pay the required contributions. [95] ¶ 15. According to the trust agreement establishing the Fund, monies paid into the Fund were to remain exclusively with the Fund as an "irrevocable trust for the sole and exclusive benefit of employees" and could not be subject to sale, transfer, or assignment. [95] ¶ 18. The trust agreement also stated that "[i]n no event shall the employers, directly or indirectly, receive any refund of contributions made by them to the trust fund, either during the term of this Agreement or upon its termination." [95] ¶ 20.

The Fund is managed by a Fund manager and a board of six trustees (three employer and three union representatives). [92] ¶¶ 3–4; [95] ¶ 11. Under the Fund's collection procedures, signatory employers were required to timely submit contributions to the Fund for hours worked by covered employees, and in accordance with the collective bargaining agreement, the fund would monitor (monthly) the number of roofing employees to determine the proper surety bond amount. [95] ¶¶ 31, 33. A Delinquency Committee (consisting of two employer and

two union trustees) had authority to make delinquency determinations and to decide consequences for delinquency. [95] ¶ 34. An employer could be deemed "Seriously Delinquent" for failing to pay contributions or maintain a proper surety bond or alternate security. [92] ¶ 16; [95] ¶¶ 25, 32. "Seriously Delinquent" was defined under the Fund's collection procedures as a "signatory employer who . . . has not posted a surety bond/alternate security escrow for six (6) or more months." [92] ¶ 16; [95] ¶ 32. Under the collective bargaining agreement and the Fund's collection procedures, any employees of an employer deemed "Seriously Delinquent" do not accrue health and welfare benefit eligibility while the employer is not in compliance. [95] ¶¶ 26, 32.

In March 2012, the Fund notified Brigadier that, based on the collective bargaining agreement and the company's 2011 work year, Brigadier was required to have a surety bond or alternate security escrow of $25,000 as of June 1, 2012. [95] ¶ 36. This was the minimum escrow required under the collective bargaining agreement. [95] ¶ 36. The following month, the Fund notified Brigadier that the trustees had decided to increase Brigadier's surety bond requirement to $35,000 (to be paid by June 1, 2012) because Brigadier's February 2012 report had an increased number of employees. [95] ¶¶ 24, 37.

Brigadier already had a surety bond of $25,000 but it was canceled on November 1, 2012. [92] ¶ 13.[3] Later that month, the Fund notified Brigadier that

---

[3] Brigadier contends that the bond was canceled because Brigadier could not afford it. The Fund argues that Brigadier had enough money because it later paid nearly $23,000 for

the Fund had been informed (by the union) that Brigadier's surety bond was canceled. [92] ¶ 14; [95] ¶ 38. The Fund explained that Brigadier was in violation of the collective bargaining agreement's surety bond requirement and could be found Seriously Delinquent if Brigadier did not submit a surety bond, alternate security, or escrow in the amount of $35,000 within 30 days. [92] ¶ 14; [95] ¶ 38. Although Brigadier did not have a surety bond, it continued to pay contributions to the Fund. [92] ¶ 28; [95] ¶ 44.

In early January 2013, the Fund notified the union that it deemed Brigadier to be "Seriously Delinquent" because of its non-compliance with the surety bond requirement. [92] ¶ 15; [95] ¶ 40. The union filed a grievance against Brigadier for violating the collective bargaining agreement by failing to obtain a proper surety bond or alternate security. [95] ¶ 41. Brigadier attended the grievance hearing on January 10, and the union notified Brigadier on January 14 that it had 60 days to obtain a proper surety bond or alternate security. [95] ¶ 41.

That same day, the Fund also wrote to Brigadier's employees that Brigadier had been deemed Seriously Delinquent for non-compliance with the bond requirement and therefore employees who worked for Brigadier on or after the effective date of non-compliance (January 14, 2013) "WILL NOT ACCRUE CREDIT FOR WELFARE TRUST FUND BENEFIT ELIBILITY for such hours worked." [95]

---

COBRA health insurance for an employee, which Brigadier would not have had to pay if it had the surety bond. [92] ¶ 13.

¶ 42.[4] Pursuant to the collective bargaining agreement, the trust agreement, and the Fund's collection procedures to which Brigadier was bound, as of February 2013, health and welfare coverage did not accrue for hours worked by Brigadier's employees. [95] ¶ 46.[5]

In April 2013, the Fund wrote to Brigadier again, stating that based on the collective bargaining agreement, the company's work history, and its delinquent status, Brigadier was required to provide a surety bond or alternate security of $50,000, which was the highest surety bond established for Brigadier in the last four years. [95] ¶ 43. That month and the following month, the Fund again wrote to several of Brigadier's employees who continued to report hours worked for Brigadier, reminding them that they would not accrue credit for hours worked for Brigadier after January 14, 2013, and until Brigadier was no longer deemed Seriously Delinquent. [95] ¶ 44.[6] Despite this notice, some employees covered under the collective bargaining agreement continued to work for Brigadier from January 2013 through May 2015, and Brigadier continued to pay contributions to the Fund for those hours worked. [95] ¶ 44. The Fund's contributions coordinator continued to send Brigadier preprinted monthly report and remittance forms for the contribution payments, knowing that Brigadier's employees would not receive credit for benefit

---

[4] Brigadier denies this statement of fact because one employee did not receive the letter. Rachal, the Fund manager, testified that the letter to one employee remained unclaimed but that the Fund kept certified receipts for the other employees. [95-3] at 32.

[5] Brigadier admits this statement of fact but argues that such action was unlawful.

[6] The statement of fact says "June 14" but that is a typo, as the correspondence states "January 14." [78-25].

eligibility while Brigadier was delinquent. [92] ¶¶ 28–30, 32. From February 2013 through May 2015, Brigadier paid over $65,000 in contributions to the Fund. [92] ¶ 28.[7] From December 2013 through May 2015, Brigadier also paid around $23,000 for COBRA health insurance for one employee who was not receiving benefits through the Fund. [92] ¶ 37; [95] ¶ 49.

In October 2013, pursuant to Brigadier's request, the Fund wrote to Brigadier, explaining that, based on a section of the Fund's collection procedures, an employer will be deemed Seriously Delinquent for failing to provide a proper surety bond and that employees of a Seriously Delinquent employer will not accrue health and welfare benefits. [95] ¶ 47. The following month, also pursuant to Brigadier's request, the Fund provided Brigadier with a copy of the collective bargaining agreement, the Fund's collection procedures, a list of the Fund's board of trustees, and copies of correspondence sent to the union and Brigadier's employees regarding Brigadier's Seriously Delinquent status and its impact on Brigadier's employees' eligibility for benefits should they continue to work with Brigadier. [95] ¶ 48.

Brigadier had contacted several entities to inquire about obtaining a bond, but the collective bargaining agreement also provided that in lieu of a surety bond or alternate security, the Chicago Roofing Contractors Association could post a blanket bond with corporate security on behalf of the association's members, subject

---

[7] Brigadier contends that it paid over $117,000 from November 2012 through May 2015. The Fund responds that Brigadier paid only around $65,000 in contributions from February 2013 through May 2015. [92] ¶ 28. February 2013, however, is the relevant date as that is when employees no longer accrued coverage. The exact amount is not dispositive for resolving the legal issues raised in the parties' cross-motions.

to the union's approval of the amount of the bond. [92] ¶¶ 17, 20; [95] ¶ 23. In April 2014, Brigadier asked the association to post a blanket bond, but the association declined to do so. [92] ¶ 21.

In November 2014, the Fund manager sent Brigadier a letter stating that the Fund agreed to reduce the amount of Brigadier's bond to $25,000 if Brigadier complied with the terms of the union's grievance committee's settlement offer and if the bond was in place by December 31, 2014. The letter also stated that if Brigadier did not comply, then the Fund would reconsider Brigadier's bonding requirement. [92] ¶¶ 22–23. That same month, the union's grievance committee informed Brigadier that Brigadier was assessed a $2,500 fine for violating the collective bargaining agreement by failing to obtain a proper surety bond. [95] ¶ 50.

On December 23, 2014, Brigadier requested that the Fund refund Brigadier's contributions for work performed by its employees from October 2012 through November 2014 (calculated by Brigadier as $79,598.98). [92] ¶ 41; [95] ¶ 51. The letter stated that Brigadier would sue unless it received payment by December 30, 2014. [78-28]. On December 31, 2014, Brigadier filed suit against the Fund, asserting a restitution claim. [1].

In March 2015, Brigadier gave notice that it was terminating its collective bargaining agreement with the union, effective May 31, 2015. [92] ¶ 39; [95] ¶¶ 55–56. Brigadier's obligation to provide a bond ceased as of May 2015. [92] ¶ 45. However, also in March 2015, Brigadier had obtained a $25,000 surety bond (effective January 2015) but did not notify the Fund or the union about it until

August 2016, when the bond was produced in discovery. [92] ¶ 25; [95] ¶¶ 53–54; [101] ¶ 1.

After this lawsuit was filed in December 2014, the Fund moved to dismiss Brigadier's complaint. [11]. Brigadier missed the deadline to respond to the Fund's motion and instead sought leave to file an amended complaint. [15]; [17]. Over the Fund's objection, Brigadier was permitted to file its amended complaint, adding state-law claims for fraudulent and negligent misrepresentation. [27]; [29]; [39-1]. The Fund once again moved to dismiss, and Brigadier responded by moving to strike the Fund's motion, arguing that the court already ruled on the merits of the Fund's motion to dismiss when it granted Brigadier leave to file its amended complaint. [30]; [33]. The court granted the motion to strike, stating that it had impliedly addressed the Fund's arguments when it allowed Brigadier to file the amended complaint. [45].[8]

## III.  Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no

---

[8] After the parties filed their cross-motions for summary judgment ([77], [80]), this case was transferred to me. [97].

genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Cross-motions must be evaluated together, and the court may not grant summary judgment for either side unless the admissible evidence as a whole—from both motions—establishes that no material facts are in dispute." *Bloodworth v. Village of Greendale*, 475 Fed. App'x 92, 95 (7th Cir. 2012).

## IV.  Analysis

### A.  Restitution Claim

The Fund moves for summary judgment on Brigadier's restitution claim, arguing that ERISA prohibits the Fund from refunding Brigadier's contributions. Brigadier also moves for summary judgment on this claim, arguing that if it does not receive a refund, the Fund would be unjustly enriched to Brigadier's detriment because the Fund did not apply its rules uniformly.

The Employee Retirement Income Security Act regulates "employee welfare benefit plans" that hold assets in trust to provide for plan beneficiaries, such as through the purchase of insurance or other benefits. 29 U.S.C. §§ 1002(1), 1103(a); *see UIU Severance Pay Trust Fund v. Local Union No. 18-U, United Steelworkers of Am.*, 998 F.2d 509, 510 (7th Cir. 1993). Section 403(c) requires that "the assets of a plan shall never inure to the benefit of any employer" and permits refunds for excess employer contributions made "by a mistake of fact or law," 29 U.S.C. § 1103(c), and places "strict limits on the circumstances under which a multiemployer fund may refund employer contributions in order to further ERISA's primary purpose of protecting and stabilizing the assets of employee pension plans, thereby safeguarding the interests of plan participants and their beneficiaries."

*Mazza v. Sheet Metal Workers' Nat'l Pension Fund*, 410 Fed. App'x 464, 469–70 (3d Cir. 2010).

Section 403(c) "*permits* plan trustees to return to employers payments made to a plan which are the result of a mistake of law or fact" but "it does not establish a cause of action by which employers may seek to *compel* such a refund." *UIU Severance*, 998 F.2d at 512–13. Instead, employers may pursue recovery of mistaken contributions under a federal common-law theory of restitution—otherwise, employers would be left to the mercy of plan trustees who have no financial incentive to return mistaken payments.[9] *Id*. This cause of action is "equitable in nature" and "recovery will not follow upon a showing that [the employer] contributed more than was required but only if 'the equities favor it.'" *Id*. at 513; *see Mazza*, 410 Fed. App'x at 467; *see also Operating Eng'rs Local 139 Health Benefit Fund v. Gustafson Constr. Corp.*, 258 F.3d 645, 651 (7th Cir. 2001) ("[M]erely because a payment is made by mistake doesn't give the payor an automatic right to the return of the payment."). "[W]here there are no equities strongly favoring the employer, the risk of mistake should fall upon the employer" because that was Congress's intent. *Frank L. Ciminelli Constr. Co. v. Buffalo Laborers Supp. Unemployment Benefit Fund*, 976 F.2d 834, 836 (2d Cir. 1992).

In determining whether an employer is entitled to a refund, courts consider various factors, including whether: (1) the contributions are the sort of mistaken

---

[9] Brigadier's restitution claim is governed by federal common law and therefore this court has federal question jurisdiction under 28 U.S.C. § 1331.

payments that equity demands be refunded, (2) the employer delayed bringing this action such that an equitable defense bars recovery, (3) the employer has ratified past payments by continuing payments for years without apparent question, (4) the employer has demonstrated that the plan would be unjustly enriched if recovery were denied. *UIU Severance*, 998 F.2d at 513.

Brigadier has not shown that it is properly entitled to a refund. Brigadier's contributions were not made pursuant to a mistake of fact or law. Instead, Brigadier made contributions to the Fund in order to comply with the collective bargaining agreement and trust agreements governing Brigadier's employment of union roofers (whom Brigadier continued to employ, despite being notified that they would not be eligible for benefits while Brigadier was delinquent). Contributions made in accordance with a collective bargaining agreement and trust agreement are not made in error. *See Whitworth Bros. Storage Co. v. Central States, Se. & Sw. Areas Pension Fund*, 794 F.2d 221, 236 n.25 (6th Cir. 1986) (to prevail on refund claim, an employer must show that it "paid contributions to defendant [fund] which [plaintiff] was not obligated to pay pursuant to the collective bargaining agreement and trust agreement entered into by the parties"); *Mazza*, 410 Fed. App'x at 469 (plaintiffs did not make contributions in error where "they very deliberately made the contributions so as to comply with the Local 25 collective bargaining agreement"); *see also British Motor Car Distribs., Ltd. v. San Francisco Auto. Indus. Welfare Fund*, 882 F.2d 371, 376 (9th Cir. 1989) (unlike clerical or arithmetical mistakes made by employers, alleged actuarial errors went to decision-making

process required of plan fiduciaries under ERISA and the trust agreement and were not mistakes of fact).

Providing Brigadier with a refund would run "afoul of § 403(c) of ERISA, which excuses from the requirements of the anti-inurement and exclusive benefit rule only a refund of those employer contributions that were made on the basis of a mistake of fact or law." *Mazza*, 410 Fed. App'x at 469. Brigadier provides no response to the point that, under the collective bargaining agreement and trust agreements, it was contractually bound to make these contributions while employing union roofers. Instead, Brigadier argues that the "mistake" was its belief that employees would still be eligible for benefits while Brigadier was "Seriously Delinquent" and without a surety bond. While Brigadier cites to *Central States, Southeast and Southwest Areas Health & Welfare Fund v. Borden, Inc.*, 736 F.Supp. 788, 792–93 (N.D. Ill. 1990), for the proposition that a "mistaken belief" is sufficient for restitution, *Borden* merely held that the employer's alleged mistaken belief as to the appropriate contribution rate stated a claim to survive a motion to dismiss. Brigadier's mistaken belief about the *effect* of its payments, however, has no bearing on the correctness of its *obligation* to make contributions in accordance with the collective bargaining agreement and trust agreement while employing union roofers.

And Brigadier's argument that it believed that its employees were still eligible for benefits is implausible—it is contradicted by the collective bargaining agreement, the Fund's notifications, and Brigadier's own actions. The collective

bargaining agreement clearly states: "Employees of Employers who are 'seriously delinquent,' as that term is defined by the Trustees of the Roofers' Unions Welfare Trust Fund . . . *shall not accrue benefits for health and welfare benefit eligibility for any employment by the Employer during any period of time that the Employer is not in compliance* with all conditions established by the Delinquency Committee." [78-15] at 22 (Art. X, § 10) (emphasis added); [95] ¶¶ 26, 46. Brigadier and its employees were also specifically and repeatedly notified that employees would not be eligible for contributions as long as Brigadier remained delinquent. [95] ¶¶ 42, 44, 47–48. Brigadier knew that employees were not eligible for welfare benefits, because it started paying for COBRA insurance for at least one employee, but Brigadier continued to make contributions anyway. On this record, there is no mistake of fact or law in the record to support restitution of Brigadier's contributions under § 403(c).

Even if the contributions had been mistaken, Brigadier's delay in taking action also weighs against granting it restitution. "[I]n determining the balance of equities, sleeping on one's rights is always a consideration. This is particularly so in the case of pension, benefit, and welfare funds. Time is important because a fund generally must be able to rely upon its current calculation of total assets." *Ciminelli*, 976 F.2d at 836. Brigadier continued paying contributions for over two years after being notified that employees were not eligible for plan benefits. And, most notably, Brigadier continued to make contributions after paying $23,000 for separate health insurance for one of the employees, and continued to make

contributions for several months even after requesting a refund from the Fund in December 2014. By continuing to make payments, Brigadier ratified past payments. *See, e.g., Teamsters Local Union No. 727 Health & Welfare Fund v. L & R Grp. of Cos.*, No. 11 C 1747, 2016 WL 520998, at *21 (N.D. Ill. Feb. 10, 2016) (employer ratified overpayments by continuing to make them for five years without question), *aff'd* 844 F.3d 649 (7th Cir. 2016).

Brigadier also has not shown that the fund would be unjustly enriched, to Brigadier's detriment, if the contributions are not refunded. Mere enrichment is not enough—that enrichment must be unjust, because recovery does not follow automatically upon a showing that an employer contributed more than what is required. *UIU Severance*, 998 F.2d at 513. The strongest factor weighing against the Fund is that Brigadier's employees did not receive welfare benefits from February 2013 through May 2015, despite Brigadier's continued contributions. *See, e.g., Construction Indus. Ret. Fund v. Kasper Trucking, Inc.*, 10 F.3d 465, 467 (7th Cir. 1993) (employer not entitled to restitution for mistaken payments to welfare fund because the employees received health coverage). But Brigadier has cited no evidence that the Fund has used contributions for anything other than to pay welfare benefit claims (albeit not for Brigadier's employees after February 2013), or in some cases to refund overpayments to employers. *See* [95] ¶¶ 18–19.[10]

---

[10] Brigadier argues that the Fund's retention of its contributions violates 29 U.S.C. § 186(a) and (b), but these anti-bribery provisions of the Labor Management Relations Act are not relevant to the question of whether a multi-employer welfare benefit fund ought to return contributions held in trust for all covered employees.

While unfortunate, Brigadier's reported financial difficulties in obtaining a bond do not favorably factor into the "equities" of its restitution claim. "To say that the common law action is 'equitable' is not to say that all depends on the judge's sympathies. 'Equity is no longer granted or withheld according to the chancellor's sensibilities and his regard for the uprightness of the parties. [It] is designed to achieve compliance with established rules, and even the wicked have a right to treatment according to the rules.'" *Kasper*, 10 F.3d at 468–69 (quoting *Polk Bros., Inc. v. Forest City Enters., Inc.,* 776 F.2d 185, 193 (7th Cir. 1985)). The surety bond was designed to protect employees if the employer was unable to make contributions to their benefit fund. Brigadier's alleged financial difficulties in obtaining a bond suggest that the Fund was well within its discretion (especially under the terms of the collective bargaining agreement and related agreements) to enforce that requirement.

Brigadier has not shown that the Fund's retention of its contributions was to Brigadier's detriment. By continuing to make fund contributions while delinquent, Brigadier was able to continue employing union roofers. *See* [95] ¶ 15; [78-15] at 21 (under Article X, § 9, the union could withdraw workers if Brigadier stopped making contributions). Therefore Brigadier obtained a benefit from its contributions and therefore is not entitled to restitution. *See Mazza*, 410 Fed. App'x at 468 n.1 (equities did not favor employer who, by making contributions, was able to hire the union workers needed to complete its contracts and remain in business, which inured to its benefit).

Ideally, employees covered under the collective bargaining agreement should receive benefits through the Fund, but the fault here largely lies with Brigadier (and, to an extent, its employees, who were notified that they would not receive welfare benefits yet continued to work for Brigadier). And the irregular manner in which Brigadier sought a refund of its contributions was largely self-defeating. From the evidentiary record, it seems likely that the Fund would have granted a refund of the contributions if Brigadier had obtained the appropriate bond or security, notified the fund, and then requested a refund. *See* [92] ¶¶ 26–27. Instead, Brigadier requested a refund two days before the Christmas holiday—before it had even obtained a bond to correct its delinquent status—and filed suit a week later. A few months after that, Brigadier obtained a bond but did not notify the Fund until producing the bond in discovery, over a year after filing suit. The timing of Brigadier's suit did not give the Fund an actual opportunity to consider Brigadier's request for a refund or to respond, and suggests that Brigadier attempted to shortcut that administrative process for resolving Brigadier's claim. In considering the equities, Brigadier's attempt to end-run around the administrative process weighs against restitution. And even if the fund had immediately denied Brigadier's request before Brigadier filed suit, any such denial would not have been arbitrary or capricious at that time.[11] Brigadier did not yet have an appropriate bond or security

---

[11] Brigadier suggests that the determination that it was delinquent was made prematurely, before its six months were up because its bond was canceled in November 2012. But Brigadier needed a $35,000 bond by June 1, 2012, and was determined to be Seriously Delinquent in January 2013, over six months later.

as required under the agreements.[12] The Fund only became aware of the bond near the end of discovery in this lawsuit. The equities do not weigh in Brigadier's favor, and I conclude that on the undisputed facts, the Fund is entitled to judgment on the restitution claim.

### B.    Misrepresentation Claims

The Fund contends that Brigadier's state-law claims for fraudulent and negligent misrepresentation are preempted by ERISA and that, regardless of preemption, Brigadier cannot prove these claims at trial based on the undisputed factual record. Brigadier responds that, under the law of the case doctrine, I cannot consider the Fund's preemption argument because it was already rejected by the prior judge on this case, when he permitted Brigadier to file its amended complaint (over the Fund's objection) and struck the Fund's motion to dismiss that complaint. *See* [29]; [39-1]; [45].

The law of the case doctrine provides that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case. *Redfield v. Continental Cas. Corp.*, 818 F.2d 596, 605 (7th Cir. 1987) (citing *Arizona v. California*, 460 U.S. 605, 618 (1983)). But unlike the doctrine of stare decisis, the law of the case doctrine is discretionary, "merely expresses the practice of courts generally to refuse to open what has been decided, not a limit to

---

[12] Brigadier argues that other employers who failed to furnish a surety bond were not labeled as Seriously Delinquent, but the Fund cites evidence indicating that the circumstances were different (e.g., the employers soon obtained a bond, stopped working in the union's jurisdiction, terminated the collective bargaining agreement, or filed for bankruptcy). *See* [92] ¶¶ 50–51; [101] ¶¶ 3–8.

their power," *id.* (quoting *Messenger v. Anderson*, 225 U.S. 436, 444 (1912)), and "is no more than a presumption, one whose strength varies with the circumstances." *Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1227 (7th Cir. 1995). The duty of adherence is less rigid if the ruling in question was by the same court, *Avitia*, 49 F.3d at 1227, and when the prior order is interlocutory. *Galvan v. Norberg*, 678 F.3d 581, 587 (7th Cir. 2012). "A judge may reexamine his earlier ruling (or the ruling of a judge previously assigned to the case, or of a previous panel if the doctrine is invoked at the appellate level) if he has a conviction at once strong and reasonable that the earlier ruling was wrong, and if rescinding it would not cause undue harm to the party that had benefited from it." *Avitia*, 49 F.3d at 1227 (citing *Arizona*, 460 U.S. at 618 n.8).

The circumstances here support a less rigid adherence to the law of the case. The earlier rulings on Brigadier's amended complaint and the Fund's motion to dismiss were non-final orders subject to reconsideration at any time before entry of judgment. *See* Fed. R. Civ. P. 54(b). Revisiting the issue upon summary judgment does not cause undue harm to Brigadier, who would have developed the factual record anyway to proceed on its federal common law restitution claim. This is especially true when, preemption aside, summary judgment for the Fund is warranted on Brigadier's state-law claims.

Section 514(a) of ERISA states that the act preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered under ERISA. 29 U.S.C. § 1144(a). A law "relates to" an employee benefit plan if it

has a connection with or reference to such a plan. *Kolbe & Kolbe Health & Welfare Benefit Plan v. Medical Coll. of Wis, Inc.*, 657 F.3d 496, 504 (7th Cir. 2011) (citing *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 139 (1990)). "ERISA thus preempts a state law claim if the claim requires the court to interpret or apply the terms of an employee benefit plan," but it does not preempt a state-law claim that merely "requires a cursory examination of ERISA plan provisions." *Id.*

Brigadier's fraudulent and negligent misrepresentation claims require showing: (1) a false statement of material fact; (2) known or believed to be false by the person making it (for fraudulent misrepresentation) or for which the defendant was negligent in ascertaining its truth (for negligent misrepresentation); (3) an intent to induce the plaintiff to act; (4) justifiable reliance on the truth of the statement; (5) damages to the plaintiff from that reliance; and (6) for negligent misrepresentation, a duty on the party making the statement to communicate accurate information. *See Doe v. Dilling*, 228 Ill.2d 324, 342–43, 360 (2008). Brigadier argues that Fund made misrepresentations on the monthly, preprinted remittance forms provided to Brigadier to report employee hours. The bottom of each remittance form states: "IN RELIANCE ON EMPLOYMENT REPORTED ON THIS REMITTANCE FORM, INDIVIDUALS REPORTED BY YOUR COMPANY AS HAVING PERFORMED BARGAINING UNIT WORK WILL RECEIVE . . . CREDIT TOWARD BENEFIT ELIGIBILITY FROM THE ROOFERS' UNIONS WELFARE TRUST FUND." [92] ¶ 29; [95-2] at 65. Brigadier's president says that

she completed these forms and relied on their representation that Brigadier's employees would receive credit toward benefit eligibility. [92] ¶¶ 10, 31.

Here, Brigadier's state-law misrepresentation claims are preempted by ERISA because they require analyzing the terms of the Fund's plan, which Brigadier agrees is covered under ERISA. The Fund notes that the monthly forms also state, just above this paragraph, that: "The undersigned, on behalf of the contributing employer, further agrees to be bound by the terms of the current applicable Roofers' Union Local 11 Collective Bargaining Agreement and to the terms of the applicable Funds' Trust Agreements." [92] ¶ 29; [95-2] at 65. The terms of the ERISA plan and its corresponding agreements are not merely tangential to the alleged misrepresentations but are at the core of Brigadier's misrepresentation claim, including whether the statements on the monthly forms were false and whether Brigadier justifiably relied on such statements. Brigadier's state-law claims "relate to" ERISA and are therefore preempted.

Even if Brigadier's state-law claims were not preempted, Brigadier cannot establish a claim for fraudulent or negligent misrepresentation. Both claims require Brigadier to establish that its reliance was justified or reasonable. Even assuming that the statements on the preprinted monthly contribution forms were false, Brigadier cannot show justifiable reliance on those statements. Brigadier argues that its reliance was reasonable because its employees were credited for benefits for the prior 17 years and Fund representatives said that Brigadier would get credited when Brigadier submitted a bond. But the Fund representatives made those

statements during their depositions, not at the time Brigadier was making contributions.[13] Brigadier's reliance was not reasonable in light of the undisputed evidence of: the express terms of the collective bargaining agreement and the trust agreement (which withheld benefits from employees while Brigadier was delinquent); the Fund's repeated communications to Brigadier and its employees confirming that employees would not receive benefits while Brigadier was delinquent; Brigadier's own conduct of continued monthly contributions despite paying around $23,000 in insurance for employees no longer receiving benefits; and Brigadier's acknowledgment that its employees' welfare benefits were tied to Brigadier obtaining a bond, which Brigadier failed to do.

The Fund is entitled to summary judgment on Brigadier's state-law law claims.

## V.     Conclusion

Defendant's motion for summary judgment, [77], is granted. Plaintiff's motion for summary judgment, [80], is denied. The Clerk shall enter final judgment in favor of defendant.

ENTER:

Manish S. Shah
United States District Judge

Date: June 30, 2017

---

[13] At their depositions during this litigation, the Fund manager and a Fund trustee testified that if Brigadier eventually obtained a bond and was no longer delinquent, Brigadier's employees would have been credited for the health insurance that they did not receive while Brigadier was delinquent. *See* [92] ¶¶ 26–27.